**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0368-22

JACOB SPIGELMAN,

    Plaintiff-Appellant,

v.

1ST CONSTITUTION BANK, a bank
chartered by the STATE OF NEW JERSEY,
THOMAS PATSAROS, GMK
PROPERTIES, LLC, formerly known as
GYMK ENTERPRISES, a limited liability
company of the STATE OF NEW JERSEY,
STARMAR PROPERTIES, LLC, a limited
liability company of the STATE OF NEW
JERSEY, SIVA KANAKAMEDALA,
CONTINENTAL DINER RESTAURANT
CORPORATION, a corporation of the
STATE OF NEW JERSEY,
CONTINENTAL DINER, LLC, a
corporation of the State of New Jersey, and
JJDN CROWN CORP., a corporation of the
STATE OF NEW JERSEY,

    Defendants-Respondents.

_____

Argued December 13, 2023 – Decided December 24, 2024

Before Judges Accurso, Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0526-18.

John E. Shields, Jr., argued the cause for appellant (Helmer, Conley & Kasselman, PA, attorneys; John E. Shields, Jr., of counsel and on the briefs).

James H. Forte argued the cause for respondent 1ST Constitution Bank (Saiber, LLC, attorneys; James H. Forte, on the brief).

Mark S. Kancher argued the cause for respondents Siva Kanakamedala, GMK Properties, LLC, and Starmar Properties, LLC (Mark S. Kancher, on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

This appeal arises out of plaintiff Jacob Spigelman's efforts to collect approximately $3,000,000 in loans he made to Thomas Patsaros, who had pledged to plaintiff rents due defendant Starmar Properties, LLC (Starmar) by Wawa Inc. (Wawa) under a lease as collateral for the loans. Patsaros owned a forty-five-percent interest in Starmar, and the remaining fifty-five-percent interest is owned by defendant GMK Properties, LLC (GMK). Defendant Siva

Kanakamedala (Siva)[1] is the sole member of GMK. Defendant 1st Constitution Bank (the Bank) had separately made loans of approximately $2,900,000 to corporate entities owned by or affiliated with Patsaros, and he had pledged to the Bank his forty-five-percent ownership interest in Starmar as collateral for his personal guarantee of those loans.

When Patsaros defaulted on his obligations to the Bank and plaintiff, the Bank disposed of its collateral—Patsaros's ownership interest in Starmar—in a private sale to Siva for $1,000,000. Long prior to that sale, Wawa had terminated its lease with Starmar and, as a result, there was no rental income from the lease available to Starmar under the collateral—Starmar's rental receipts pursuant to the lease—Patsaros had pledged to secure the loans from plaintiff.

Plaintiff appeals from an order granting the Bank summary judgment on plaintiff's claim the Bank's sale of Patsaros's interest in Starmar was commercially unreasonable and otherwise violated statutory provisions governing the disposition of collateral. Plaintiff also appeals from an order granting Siva, Starmar, and GMK summary judgment on plaintiff's claim that

---

[1]  In the briefs filed before the motion court and on appeal, defendant Siva Kanakamedala refers to himself by his first name. For purposes of consistency and clarity, we do so as well, intending no disrespect.

they tortiously interfered with his contractual rights and prospective economic advantage. Finding no merit to plaintiff's arguments on appeal, we affirm the challenged orders.

I.

We review the grant or denial of summary judgment de novo, applying the same legal standard as the trial court. Crisitello v. St. Theresa Sch., 255 N.J. 200, 218 (2023). Under that standard, a court must "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "We owe no deference to conclusions of law that flow from established facts." Crisitello, 255 N.J. at 218. We apply these standards to our review of the summary-judgment orders challenged on appeal.

A-0368-22

Because the Bank and Siva, Starmar, and GMK separately filed their summary-judgment motions, the record before the court on each motion is different. We therefore first address plaintiff's challenge to the order granting the Bank's motion and then address plaintiff's challenge to the order granting summary judgment to Siva, Starmar, and GMK. In doing so, we summarize the facts pertinent to each motion, based on the separate records presented to the motion court, in the light most favorable to plaintiff, as the non-moving party, and give him the benefit of all legitimate inferences in support of his claims, see R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

A.

The undisputed material facts pertinent to a disposition of plaintiff's appeal from the order granting summary judgment to the Bank may be summarized as follows.

In December 2006, GMK and Patsaros executed a "MEMORANDUM OF JOINT VENTURE" for the stated purpose of memorializing a joint venture in which GMK agreed to sell Patsaros property in Mount Laurel under the terms of a July 2004 purchase-and-sale agreement. At the same time, GMK executed a $240,000 promissory note in Patsaros's favor that was to be repaid in accordance with the terms of the July 2004 purchase-and-sale agreement.

Patsaros paid Siva $240,000 towards the purchase of the property, but the sale of the property never took place. GMK and Patsaros later formed Starmar for the purpose of developing the Mount Laurel property.

In 2011, Patsaros executed a $2,848,146 promissory note (the restructured note) in favor of the Bank on behalf of various corporate entities in which he had an ownership interest or was employed, and a separate $100,000 promissory note (the $100,000 note) on behalf of a separate limited liability company in which he had an ownership interest.[2] To secure payment of the notes, the corporate entities executed mortgages on various real properties in Burlington County and other guarantees of payment. Patsaros executed personal guarantees of the obligations under the two notes.

To induce the Bank to make the loans, Patsaros also executed a Pledge Agreement "grant[ing] the Bank a security interest in, and pledg[ing] to the Bank, all of his right, title and interest in" various collateral, including "Patsaros's [forty-five-percent] membership in" Starmar. The Bank secured its interest in the Starmar collateral by taking possession of Patsaros's certificate

---

[2] Patsaros executed the $2,848,146 promissory note on behalf of JJDN Crown Corp. and Star Food and Beverage, LLC, as part of a restructuring of a 2007 loan on which JJDN Crown Corp. had defaulted. Patsaros executed the $100,000 promissory note on behalf of 130 Star Properties, LLC.

representing his interest in Starmar and receiving from Patsaros "an executed stock power."

Patsaros and GMK were the members of Starmar. The managing member of GMK, which held a fifty-five-percent interest in Starmar, is Siva.

In or about July 2011, Starmar entered into a land lease with Wawa, pursuant to which Starmar leased to Wawa the Mount Laurel property that had been the subject of Patsaros and GMK's 2006 joint venture agreement and 2004 purchase-and-sale agreement. The lease included a provision stating Starmar "represents and warrants that it has good and marketable title to the" Mount Laural property. At the time of the lease agreement, however, the property was owned by GMK. Plaintiff contends Wawa was aware Starmar did not own the property when it entered into the lease agreement. When Starmar entered into the lease agreement with Wawa, it had no other assets.

On September 14, 2014, Patsaros executed in favor of plaintiff a Limited Collateral Assignment of Contract Rights on behalf of Starmar. The assignment was made for the purpose of extending financing to Starmar or Patsaros and any other entity owned by Patsaros. The assignment assigned to plaintiff Starmar's rights, title, and interest in any sums due Starmar under its lease with Wawa. It is undisputed plaintiff had obtained the assignment to secure Patsaros's

obligations for the approximately $3,000,000 plaintiff had loaned to him. There is no evidence plaintiff had ever loaned money to Starmar.

During 2014 and 2015, the various corporate entities that had borrowed from the Bank defaulted under the restructured note and the $100,000 note. In accordance with Patsaros's Pledge Agreement, the defaults entitled the Bank to sell the collateral Patsaros had pledged to secure the loans—his forty-five-percent interest in Starmar.

On September 17, 2015, plaintiff's counsel wrote a letter to Wawa advising that Starmar had executed the September 14, 2014 Limited Collateral Assignment of Contract Rights that assigned Starmar's rights to rent from Wawa under its lease for the Mount Laurel property in the event of defaults on loans plaintiff had made to Patsaros. The letter advised there had been defaults on the loans and $1,827,908.54 in principal and interest was due plaintiff. The letter requested Wawa forward to plaintiff as assignee fifty percent of the future rents otherwise due Starmar. The letter was sent also to Starmar, Patsaros and his counsel, but there is no evidence it was sent to GMK, Siva, or the Bank.

Following the defaults on its loans, the Bank conducted a title search on the Mount Laurel property and determined it was owned by GYMK Enterprises, LLC, an entity that was later known as GMK. It also determined that although

8

Starmar had leased the property to Wawa, Starmar had never owned the Mount Laurel property.

In January 2016, Wawa sent a letter to Starmar and GMK stating it had learned Starmar did not own the Mount Laurel property. Wawa also declared the lease of the property it had executed with Starmar "is null and void ab initio, or in the alternative, is hereby terminated due to Starmar's failure to hold good and marketable title" to the property.

In April 2016, Siva, on behalf of GMK, entered into a lease agreement with Wawa for the Mount Laurel property, replacing the Starmar lease Wawa had terminated four months earlier. Siva did not take any steps to dissolve Starmar before GMK entered into the April 2016 lease agreement with Wawa.

Later in 2016, the Bank began its efforts to liquidate the collateral Patsaros had pledged to secure payment of the restructured note and the $100,000 note. The Bank's investigation revealed that Starmar did not own any assets, and there was no market in which to liquidate Patsaros's interest in Starmar because the certificate of his interest in Starmar was a non-publicly traded security.

Also in 2016, Patsaros, on behalf of Starmar, filed a lawsuit seeking the imposition of a constructive trust on any monies Wawa paid to GMK under the April 2016 lease and an order directing that GMK convey the Mount Laurel

9

property to Starmar. Thus, if Siva purchased Patsaros's forty-five-percent interest in Starmar from the Bank, he would become the sole owner of Starmar and would have the authority to terminate the litigation Patsaros had initiated on Starmar's behalf against GMK.

In June 2016, the Bank discussed with Siva's counsel Siva's interest in purchasing Patsaros's interest in Starmar because, as noted, Siva owned the remaining fifty-five percent of Starmar. The discussions over Siva's possible purchase of Patsaros's interest continued over the course of many months. Siva made an initial offer of $400,000. The Bank retained an appraiser to provide a value of the GMK lease with Wawa based on the assumption that "Starmar could, through litigation, somehow obtain a [forty-five-percent] interest" in the lease.

The appraiser valued the lease under two scenarios. The first was based on the assumption Wawa remained a tenant for the duration of the lease, including the available options to renew. Under that scenario, the appraiser valued the lease at $3,300,000. The second scenario was based on the assumption that Wawa terminated the lease after ten years under a provision permitting it to do so if Wawa obtained a license to sell liquor on the property and GMK exercised its right under the lease to refuse to allow Wawa to sell

10

liquor.  The appraiser valued the lease at $1,400,000 under that scenario.  The appraiser calculated Patsaros's forty-five-percent interest in those valuations at a $1,485,000 and $630,000 respectively, based on an assumption that "Patsaros had a viable claim against GMK and was successful litigating the claim."

In its determination of the value of Patsaros's interest in Starmar, the Bank also considered that Starmar had other existing debts of approximately $500,000, that, in the Bank's view, reduced the value of Patsaros's interest in Starmar.  The Bank further considered that to maximize the value of Patsaros's interest, Starmar would have to be successful in obtaining an order directing that GMK convey the property to Starmar in the separate litigation Patsaros had initiated on Starmar's behalf.  Based on the valuations provided by the appraiser, the uncertainties of litigation, and the time and attendance costs of litigation, the Bank determined it would accept an offer of $1,000,000 from Siva.

Siva increased his offer to $700,000, which the Bank rejected.  Siva made a final offer of $1,000,000, which the Bank accepted.  The Bank permitted Siva to make a $250,000 down payment in cash, and it financed the remaining $750,000.  Patsaros's Pledge Agreement with the Bank had authorized a private sale of the collateral—his interest in Starmar.

A-0368-22

On December 28, 2016, the Bank's counsel sent a letter to plaintiff, Patsaros, and Patsaros's counsel enclosing a notice of private disposition of the collateral—Patsaros's interest in Starmar. The letter advised that the Bank would privately sell Patsaros's interest sometime on or after January 9, 2017. Plaintiff contacted the Bank's counsel on January 5, 2017, about the sale but because the sale was scheduled to close on January 9, the Bank had approved the financing for the sale, and Starmar was without any assets, the Bank was not willing to cancel the sale based "on the possibility that [plaintiff] might pay, and had the ability to pay, more" for Patsaros's interest in Starmar. Prior to the Bank's December 28, 2016 letter, plaintiff had never sent any written notice to the Bank claiming he had a security or any other interest in Patsaros's forty-five-percent membership interest in Starmar.

On January 5, 2017, Patsaros filed an order to show cause in his then-pending lawsuit against GMK seeking to temporarily restrain and permanently enjoin the sale of his interest in Starmar to GMK. In support of the application, Patsaros submitted a certification from plaintiff in which plaintiff claimed that he wished to submit a bid for the Patsaros's interest in Starmar. The court denied the application. The summary judgment record, as reflected in the parties' <u>Rule</u>

4:46-2 statements, do not provide any facts concerning the outcome of the litigation that had been initiated by Patsaros.

On January 9, 2017, the Bank sold Patsaros's interest in Starmar to Siva for $1,000,000. The Bank applied the $1,000,000 to the outstanding balance on the restructured note. Following its recovery of the proceeds from the liquidation of other collateral that had secured payment of the two notes, and accounting for the $1,000,000 received from Siva, the balance due to the Bank from Patsaros and the other corporate entities under the restructured note was later determined to be $2,782,177.10, and the balance due under the $100,000 note was $106,797.09.

Plaintiff later filed a complaint asserting breach-of-contract causes of action against Patsaros and the corporate entities to which the Bank had made the loans, the repayment of which Patsaros had secured in part through his execution of the Pledge Agreement and his posting of his forty-five-percent interest in Starmar as collateral. The complaint also asserted a cause of action against the Bank alleging its sale to Siva of the collateral Patsaros had provided in the Pledge Agreement was commercially unreasonable.

Following discovery, the Bank moved for summary judgment arguing plaintiff lacked evidence the sale of the collateral was commercially

A-0368-22

unreasonable and, contrary to plaintiff's allegations, that the Bank had provided proper notification to its disposition of the collateral as required under N.J.S.A. 12A:9-611(c)(3)(A). The court heard argument on the motion and granted it, finding plaintiff lacked sufficient evidence supporting his claims. As noted, plaintiff appeals from the court's summary judgment order.

Plaintiff argues the court erred by granting summary judgment to the Bank on the cause of action in count four of his complaint alleging he suffered damages as a result of what he contends was the Bank's violation of N.J.S.A. 12A:9-610 by making a commercially unreasonable sale of Patsaros's forty-five-percent interest in Starmar to GMK for $1,000,000. Plaintiff also contends the Bank did not provide to him proper notice of the sale as required under N.J.S.A. 12A:9-611(c)(3)(A), and he is a member of the statutorily-defined class entitled to damages under N.J.S.A. 12A:9-625(c) based on the Bank's violations of N.J.S.A. 12A:9-610 and N.J.S.A. 12A:9-611(c)(3)(A). He further argues the court erred by granting summary judgment on his commercially-unreasonable-sale claim because there are genuine issues of material fact precluding judgment in the Bank's favor as a matter of law.

Plaintiff primarily argues the Bank's private sale of Patsaros's interest in Starmar was improper because the Bank failed to provide him with proper notice

14

of the sale of the collateral as required under N.J.S.A. 12A:9-611(c)(3)(A).

N.J.S.A. 12A:9-611(b) provides in pertinent part that "a secured party that

disposes of collateral under [N.J.S.A.] 12A:9-610 shall send to the persons

specified in subsection (c) a reasonable authenticated notification of

disposition." Plaintiff claims the Bank failed to provide the required notification

under subsection (c)(3)(A), which provides that where, as here, the "collateral

is other than consumer goods," the required notification must be sent to "any . . .

person from which the secured party had received, before the notification date,

an authenticated notification of a claim of an interest in the collateral." N.J.S.A.

12A:9-611(c)(3)(A).[3]

Plaintiff's claims based on the purported failure of the Bank to provide the

notification to which he claims he was entitled fails for a number of separate but

equally dispositive reasons. There is no evidence plaintiff had ever provided

the Bank with "an authenticated notification of a claim or an interest in the

collateral" such that he was entitled to a notification pursuant to N.J.S.A. 12A:9-

611(c)(3)(A). "Authenticate" is to sign, or otherwise adopt a record with the

---

[3] Under the statute, the "notification date" is "the earlier of the date on which: (1) a secured party sends to the debtor and any secondary obligor an authenticated notification of disposition; or (2) the debtor or any secondary obligor waive the right to notification." N.J.S.A. 12A:9-611(a)(1) and (2).

present intent of adopting or accepting the record.  N.J.S.A. 12A:9-102(a)(7).  The record lacks any authenticated notification from plaintiff to the Bank that plaintiff had an interest in the Bank's collateral—Patsaros's interest in Starmar.

Plaintiff argues he provided the required notification in the September 17, 2015 letter from his counsel to Wawa, copies of which were sent to Patsaros, Starmar, and N.J. Star Properties.  The letter could not have provided notice to the Bank because there is no evidence it was sent to the Bank or that the Bank otherwise received it prior to the January 9, 2017 sale.

Additionally, even if it had been sent to the Bank, the letter does not provide notice of any interest in the collateral—Patsaros's interest in Starmar— the Bank held and sold to GMK on January 9, 2017.  The letter asserts only an interest, by way of the assignment Patsaros executed on Starmar's behalf, in Starmar's right to receive rents under its lease with Wawa.  Thus, plaintiff's counsel's September 17, 2015 letter to Wawa did not constitute notice plaintiff had or claimed an interest in the Bank's collateral—Patsaros's interest in Starmar—and did not constitute the authenticated notification required under N.J.S.A. 12A:9-611(c)(3)(A) such that the Bank was required to provide plaintiff with notice of the disposition of its collateral under the statute.

16

For those same reasons, any purported failure by the Bank to provide to plaintiff notification of its disposition of the collateral Patsaros had pledged to the Bank to secure repayment of the restructured note and the $100,000 note is of no moment because plaintiff did not have, and has never claimed to have had, an interest in the Bank's collateral. Again, the record is bereft of evidence Patsaros had ever pledged his interest in Starmar to plaintiff as security for any of the loans plaintiff had made to Patsaros or the corporate entities to whom plaintiff had loaned the monies secured by Patsaros's execution on behalf of Starmar of the limited assignment of rents from Wawa. The right to those rents was not part of the collateral the Bank sold to GMK on January 9, 2017.

Thus, any purported failure by the Bank to provide notification of the sale of its collateral to Siva did not violate N.J.S.A. 12A:611(c)(3)(A). Plaintiff did not have any claim to the Bank's collateral—Patsaros's interest in Starmar—that was the subject of the Bank's sale to GMK.

The undisputed evidence further showed the collateral Patsaros had pledged to plaintiff—the assignment of Starmar's right to receive rents from Wawa—was of no value when the Bank sold Patsaros's interest in Starmar to GMK in January 2017. Under Starmar's operating agreement, Patsaros did not have the authority to unilaterally assign Starmar's rights to the rents because

17

GMK had never agreed to the assignment. Starmar also did not own the Mount Laurel property and therefore lacked the legal authority to lease the property in the first instance to Wawa. The fact that Starmar did not own the property was inconsistent with the lease's representation and warranty that Starmar had "good and marketable title to the [Mount Laurel property] in fee simple." Wawa therefore terminated the lease in January 2016, and Starmar thereafter had no entitlement to any lease payments from Wawa.[4] And, as acknowledged by plaintiff in his answers to interrogatories, Starmar had no assets following the termination of the Wawa lease.

Plaintiff argues the Bank understood he had an interest in the Bank's disposition of the collateral—Patsaros's interest in Starmar—because the Bank sent him the December 28, 2016 letter advising that it intended to sell the collateral to GMK on January 9, 2017, and the Bank's notification identified him as a limited collateral assignee. For the reasons we have explained, however,

---

[4] Plaintiff asserts there is a factual dispute as to when Wawa learned that Starmar did not own the Mount Laurel property. It claims Wawa was aware Starmar did not own the property when it entered into the lease with Starmar. The lease that Wawa executed, however, states Starmar owned the property in fee simple. It is, however, undisputed that in January 2016, Starmar did not own the property and Wawa terminated the lease as a result. In any event, we are not persuaded that any dispute about when Wawa learned Starmar did not own the property is material to a disposition of any of the issues presented on appeal.

and despite the description of him in the December 28, 2016 notification, plaintiff was not an assignee of the collateral—Patsaros's interest in Starmar—identified in the December 28, 2016 notification and therefore was not entitled to any notice at all under N.J.S.A. 12A:9-611(c)(3)(A).  Any purported failure to provide the notice therefore did not violate the statute.

In any event, even if plaintiff had been entitled to notice under the statute, we reject his claim the Bank violated N.J.S.A. 12A:9-611(c)(3)(A) because the Bank otherwise provided to plaintiff proper and timely notification of its disposition of its collateral—Patsaros's forty-five-percent interest in Starmar. N.J.S.A. 12A:9-613(1) provides that in a non-consumer transaction, notice of disposition of collateral is sufficient if it:

> (A) describes the debtor and the secured party;
>
> (B) describes the collateral that is the subject of the intended disposition;
>
> (C) states the method of intended disposition;
>
> (D) states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and
>
> (E) states the time and place of a public disposition or the time after which any other disposition is to be made.
>
> [N.J.S.A. 12A:9-6.13(1)(A) – (E).]

The Bank's December 28, 2016 notification to plaintiff was compliant in all respects with N.J.S.A. 12A:9-613(1). Plaintiff does not argue otherwise. And the evidence otherwise establishes that the notice was timely served no later than December 29, 2019, more than the ten days prior to the January 9, 2017 sale to GMK that are required under N.J.S.A. 12A:9-612(b).

We are therefore convinced plaintiff failed to present sufficient evidence establishing either that plaintiff was entitled to notification or that the Bank failed to provide the timely or sufficient notification required under N.J.S.A. 12:9-611(c)(3)(A). Plaintiff's claims to the contrary, including his contention there are genuine issues of fact material to a determination of the notification issue, are without sufficient merit to warrant any further discussion. R. 2:11-3(e)(1)(E).

We also reject plaintiff's claim the Bank violated N.J.S.A. 12A:9-610 by failing to dispose of its collateral—Patsaros's interest in Starmar—in a commercially reasonable manner. The record is devoid of any evidence permitting a rationale fact finder to conclude the Bank's sale of Patsaros's interest in Starmar was not commercially reasonable.

In his brief on appeal, plaintiff argues only that the sale of Patsaros's interest in Starmar for $1,000,000 was not commercially reasonable because his

expert witness, an appraiser, valued the Mount Laurel property, with Starmar's terminated lease with Wawa in place, at between $4,100,000 and $4,300,000. According to plaintiff, those valuations rendered Patsaros's forty-five-percent-interest in Starmar worth between $1,845,000 and $1,930,000. Plaintiff therefore argues that based on price alone, the Bank's sale of Patsaro's interest in Starmar to GMK for $1,000,000 was not commercially reasonable. Plaintiff also contends that because the Bank's appraiser valued the property with the lease between GMK and Wawa in place at between $3,300,000 and $1,400,000, there is a fact issue as to whether the $1,000,000 sale price of the Bank's collateral was commercially reasonable.

We reject plaintiff's claim because "[t]he fact that a greater amount could have been obtained by a . . . disposition . . . at a different time or in a different method from that selected by the secured party is not in itself sufficient to preclude the secured party from establishing that the . . . disposition . . . was made in a commercially reasonable manner." N.J.S.A. 12A:9-627(a). But price is all that plaintiff argues here. Thus, plaintiff's singular contention Patsaros's interest in Starmar should have been sold for more than $1,000,000 does not by itself support a finding the sale was commercially unreasonable.

In assessing whether a secured party disposed of collateral in a commercially reasonable manner, "a court looks to every aspect of the disposition," Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 542 (App. Div. 2008), "including the method, manner, time, place and terms" of the disposition. N.J.S.A. 12A:9-610. We consider those factors based on the undisputed material facts established in the parties' Rule 4:46-2 statements.

Plaintiff did not provide a valuation of Patsaros's interest in Starmar. Indeed, plaintiff's expert testified he did not appraise the value of Patsaros's interest in Starmar. Plaintiff's expert valued only Starmar's lease with Wawa but, as we have explained, the Bank's collateral consisted of Patsaros's interest in Starmar, not the assignment of the Wawa lease payments. Moreover, a year prior to the date of the Bank's January 9, 2017 sale to GMK of Patsaros's interest in Starmar, Wawa terminated the lease, leaving Starmar with no assets and $500,000 in debts. It is also undisputed that Starmar did not own the Mount Laurel property when it entered into the lease with Wawa and did not own the property when Wawa terminated the lease.

The undisputed facts further establish that Patsaros lacked the authority to execute the assignment of Starmar's right to receive rents from Wawa because the Starmar operating agreement required GMK's consent for such an

A-0368-22

assignment and Patsaros had never obtained it. Patsaros had executed the assignment in the Bank's favor to secure millions of dollars in loans the Bank had made to corporate entities in which Patsaros was an owner or an employee, none of which had any relationship with GMK or Siva. Stated differently, the undisputed facts establish Patsaros had unilaterally and without any authorization pledged Starmar's putative entitlement to rental payments due on a lease of property Starmar did not own for the purpose of securing almost $2,900,000 in loans made to Patsaros solely for his benefit.

In those circumstances, the Bank negotiated a private sale of its collateral—Patsaros's interest in an assetless and debt-ridden Starmar—for $1,000,000. A private sale of the collateral—Patsaros's interest in Starmar— was authorized by the assignment Patsaros had executed to secure the loans. And, as set forth in the Bank's statement of material facts, and admitted by plaintiff, there is no regular market available for the sale of the Patsaros's interest in Starmar.

The Bank negotiated with GMK, rejected its first two offers, and agreed to accept GMK's $1,000,000 offer, recognizing GMK had a unique interest in the collateral because its purchase of Patsaros's interest permitted it to rid itself of Patsaros as an owner of Starmar and gain control of Starmar so it could to

terminate the separate litigation Patsaros had unilaterally initiated on Starmar's behalf against GMK and Siva. Plaintiff does not dispute he was aware of the sale prior to closing on January 9, 2017, and he did not take any affirmative action, in court or otherwise, to stop it.[5] See N.J.S.A. 12A:9-625(a) (authorizing a court to "restrain . . . disposition of collateral on appropriate terms and conditions" where "it is established that a secured party is not proceeding in accordance with" Article Nine of the Uniform Commercial Code (UCC), N.J.S.A. 12A:9-101 to 9-809); Caterpillar Fin. Servs. Corp. v. Wells, 278 N.J. Super. 481, 506 (Law Div. 1994) (explaining the primary purpose of the obligation to provide notice of disposition of collateral "is to allow the debtor sufficient time to take appropriate steps to protect his [or her] interests before the final disposition" and to prevent a sale of the collateral "at less than its true value").

In our view, under those circumstances, no reasonable juror could conclude that based on the undisputed facts the Bank acted in a commercially unreasonable manner in its disposition of its collateral—Patsaros's forty-five-percent-interest in an Starmar. Plaintiff's singular contention the Bank should

---

[5] As noted, plaintiff submitted a certification in support of Patsaros's effort to prevent the Bank's sale of his interest in Starmar to GMK.

have obtained a higher price—based on an evaluation of Starmar's putative receipt of rents from a lease that had been terminated—does not permit a contrary conclusion. N.J.S.A. 12A:9-627(a).

We also reject plaintiff's contention that he is within the class of individuals entitled to recover damages from the Bank based on his claims the Bank failed to provide proper notice of the sale of the collateral and sold the collateral in a commercially unreasonable manner. N.J.S.A. 12A:9-625(c)(1) provides that a person is entitled to collect damages for their losses from a secured party that fails to comply with the requirements of Article Nine of the UCC, N.J.S.A. 12A:9-101 to 9-809, if the person "at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral." Plaintiff does not qualify under that standard as a person entitled to sue a secured party for damages.

Plaintiff is not a debtor or an obligor, but instead claims he qualified as a person entitled to sue for damages under N.J.S.A. 12A:9-625(c)(1) because he held a security interest in the collateral sold by the Bank. The undisputed facts establish that is not the case. Plaintiff had an interest in the assignment of rents due to Starmar under a terminated lease agreement with Wawa but never had a security interest in the collateral—Patsaros's interest in Starmar—the Bank sold

GMK.  In addition, to qualify as a person entitled to sue for damages under N.J.S.A. 12A:9-624(c), plaintiff must have demonstrated that the Bank failed to comply with Article Nine of the UCC, N.J.S.A. 12A:9-625(b), and plaintiff made no such showing here.  Plaintiff therefore is not within the class of persons who may sue the Bank for damages under N.J.S.A. 12A:9-625.

In sum, we affirm the court's order granting summary judgment to the Bank on plaintiff's claim he is entitled to damages as the result of the Bank's alleged but unproven violations of Title Nine of the UCC.  The undisputed facts establish otherwise and do not support plaintiff's cause of action—claiming the Bank's sale of its collateral was commercially unreasonable.

B.

As noted, following the summary-judgment award to the Bank, plaintiff filed a second-amended complaint in April 2022 asserting two causes of action. In the first, plaintiff asserted a cause of action against Siva, Starmar, and GMK (collectively "defendants") for the alleged commercially unreasonable sale of Patsaros's interest in Starmar to GMK.  In the second count of the complaint, plaintiff asserted that he enjoyed a prospective economic or contractual relationship with Patsaros and had a reasonable expectation of economic advantage based on it, and defendants intentionally and without justification or

A-0368-22

excuse interfered with that prospective economic or contractual relationship. Following additional discovery, including plaintiff's deposition, defendants moved for summary judgment. Plaintiff appeals from the order granting the motion.

Plaintiff first argues the court erred by granting the motion because defendants had previously filed two summary-judgment motions—one in 2019 and the other in 2020—and the motions had been denied. Plaintiff contends the orders denying the prior motions barred the court's consideration of defendants' third try at obtaining summary judgment. Plaintiff claims nothing had changed following the denial of the first two motions such that the court could properly consider and decide the third motion.

Plaintiff's argument ignores that the first motion for summary judgment had been denied as premature because discovery had not been completed. Plaintiff also ignores that following the denial of the second motion, he amended his complaint and added a new cause of action—intentional interference with prospective economic advantage—against defendants and that counsel had then deposed plaintiff as to those claims. Thus, contrary to plaintiff's contention, circumstances had changed following the denial of the prior motions such that defendants were not precluded from renewing their motion for a third time.

A-0368-22

Moreover, plaintiff points to no legal authority supporting his position the denial of defendants' prior motions barred the motion filed in 2022, and the prior summary judgment orders were interlocutory and therefore did not "preclude[] the entry of judgment for the moving party later in the case." Hart v. City of Jersey City, 308 N.J. Super. 487, 498 (App. Div. 1998); see also R. 4:42-2(b) (providing in part that interlocutory orders "shall be subject to revision at any time before entry of final judgment in the sound discretion of the court in the interests of justice").

Plaintiff also claims the court erred by granting defendants' motion on the merits. The facts presented to the court in the parties' Rule 4:46-2 statements provide the context within which we consider the court's order granting defendants summary judgment.[6]

---

[6] In its response to defendants' Rule 4:46-2 statement of material facts, plaintiff denied some of the assertions of fact because defendants did not include citations to the record supporting the assertions as required under the Rule. See Rule 4:46-2(a). In our view, defendants substantially complied with the Rule through their submission of Siva's certification that in numbered paragraphs corresponding to those in their statement of material facts provide competent evidence supporting the asserted material facts. We therefore rely on the statements of material fact that are supported by Siva's certification even though defendants did not properly cite to the certification in their Rule 4:46-2 statement, but only to the extent the asserted facts were not otherwise properly denied or contested in plaintiff's Rule 4:46-2(b) statement.

Siva is the majority owner of GMK and now the sole member of Starmar by virtue of his purchase of Patsaros's interest from the Bank. Siva and Patsaros formed Starmar to develop property in Mount Laurel on which Martin's Liquor, LLC, of which Siva is a majority member, operates a liquor store. At all relevant times, the property was owned by GMK.

At some point in time, Patsaros had paid Siva $240,000 towards the purchase of the property, but no transfer of the property ever occurred. Patsaros and Siva were presented with an opportunity to lease a portion of the property to Wawa for its construction and operation of a convenience store. The arrangement with Wawa required a sub-division of the Mount Laurel property. Siva and Patsaros created Starmar to pursue the opportunity to lease a portion of the property to Wawa.

When it was formed, Siva owned fifty-five percent of Starmar and Patsaros owned the remaining forty-five percent. Patsaros knew the property required sub-division approval from Mount Laurel Township for two separate parcels; one parcel for the liquor store and the other for Wawa's convenience store. Siva, on behalf of GMK, intended to transfer that portion of the property on which Wawa's store was to be located to Starmar prior to Starmar's leasing of the property to Wawa. Patsaros agreed to undertake the duty and

responsibility of obtaining the necessary approvals for the required sub-division. Patsaros, however, never took any steps to obtain subdivision approval and, at the time defendants moved for summary judgment in 2022, "Siva/GMK own[ed] the entire un-subdivided" property.

In July 2011, Patsaros nonetheless had Starmar enter into a lease agreement with Wawa to build and operate the convenience store on the non-subdivided lot, even though Starmar did not own the property and Patsaros had done nothing to subdivide it. In the lease with Wawa, Patsaros caused Starmar to represent to Wawa that Starmar had good and marketable title to the property. The lease was entered into with the understanding between Siva and Patsaros that the property would be subdivided and the property leased to Wawa would be owned by Starmar.

The realty company that had been retained on Starmar's behalf to negotiate the lease with Wawa billed Starmar for its services. Patsaros refused to contribute his forty-five-percent-share of the amount due, and the company sued. Siva paid Patsaros's share of the amount due and Patsaros refused to reimburse Siva the amount he had paid on Patsaros's behalf.

Patsaros also had opened an account at the Bank to which he owed more than $3,000,000 for loans it had given to Patsaros's for his other business

interests and debts. When Wawa began developing the property, Patsaros directed it to make the rental payments to him while Wawa built the store on the Mount Laurel property, which had never been subdivided. Patsaros deposited the rental payments in an account at the Bank in which only he received statements, and he used the funds for his own expenses and purposes unrelated to Siva or Starmar. Patsaros did not disclose to Siva that he used the Wawa rental payments for himself and that he had not taken any action to obtain the subdivision.

Siva was unaware of Patsaros's receipt of the rental payments until Wawa cancelled the lease with Starmar in January 2016. At that time, Wawa sent a letter to Patsaros and Siva, stating that because Starmar did not own, and had never owned, the property on which Wawa had built its store, Wawa was terminating the Starmar lease.

Siva, on behalf of GMK, entered into a lease with Wawa on April 7, 2016, that replaced the lease Wawa had terminated in January. Siva did not take any steps to dissolve Starmar following Wawa's termination of the lease.

Also at the time, Patsaros was in default of his obligations to the Bank. The Bank sued Patsaros, foreclosed on his other business, a diner, and seized his forty-five-percent "membership interest in Starmar, which had no assets."

A-0368-22

Patsaros also was indebted to plaintiff for over $2,000,000 in 2017 and more than $3,000,000 when defendants filed their 2022 summary-judgment motion. To secure the loans underlying that indebtedness, Patsaros had pledged Starmar's right to receive rents from Wawa under the lease.

Siva conferred with the Bank over the situation and the Bank advised Siva that unless he purchased Patsaros's interest in Starmar, Siva would have a new partner. Siva found that prospect an "anathema . . . given his experience with Patsaros." Siva did not want to purchase Patsaros's interest because Starmar did not have any assets, but he did not want the Bank to sell the interest to a third party who would become his new partner. Siva decided to pay what in his view was an overpayment to ensure he would not have another partner. Siva reached an agreement to pay the Bank $1,000,000 for Patsaros's interest in Starmar, with GMK paying $250,000 in cash and financing the balance. Siva and GMK entered into an agreement on October 26, 2016 with the Bank to purchase Patsaros's interest in Starmar, with the closing of the sale to take place on a unspecified future date.

Siva certified he purchased Patsaros's interest in good faith and to avoid having the Bank sell the interest to a third party who would then become Siva's partner. Siva also asserted in his certification that Patsaros had failed to pay his

share of Starmar's expenses, misappropriated rents Wawa had paid Starmar, and pledged his interest in Starmar to plaintiff without Siva's approval in violation of his obligations as a member of Starmar. Siva further certified "[h]e had suffered with Patsaros'[s] defalcations; defaults in his obligations; and . . . outright dishonesty," and "[h]e didn't want that to happen to him again, especially with someone he didn't know."

Siva further certified that plaintiff's lawsuit had been initiated "after two failed litigation attempts by Patsaros to retain his membership interest in Starmar." Patsaros's lawsuits were dismissed with prejudice.

During his deposition, plaintiff testified he had no facts supporting his contention that Siva had acted in bad faith by purchasing Patsaros's interest in Starmar. Plaintiff testified only that he "felt" something was wrong with the sale of the interest to GMK.

Based on those undisputed facts, plaintiff claims the court erred by granting summary judgment dismissing the claims in his second-amended complaint. In making his arguments, plaintiff does not expressly address the elements of the causes of action in the complaint. He argues only that the court erred by granting summary judgment because the evidence establishes Siva acted in bad faith or, in the alternative, there are fact issues as to whether he

acted in good faith. Plaintiff's arguments, however, are untethered to any analysis of how or if Siva's purported lack of good faith concerns the two causes of action asserted in the complaint.

Plaintiff's first cause of action sought a declaratory judgment and damages on his claim that GMK's purchase of Patsaros's interest in Starmar was not commercially reasonable under N.J.S.A. 12A:9-610 and for recission of the January 2017 sale. Although the motion court was presented with a somewhat different record on defendants' summary-judgment motion than the one presented on the Bank's prior motion on the identical UCC claim, the pertinent undisputed facts and applicable law are the same. Thus, for the reasons we provided as the basis for our determination that the Bank's sale of Patsaros's interest in Starmar was commercially reasonable in our analysis of plaintiff's appeal from the order granting summary judgment to the Bank, we affirm the court's summary-judgment award to defendants on plaintiff's cause of action based on the alleged commercial unreasonableness of the sale to GMK. Most simply stated, the evidence establishes the Bank complied with the requirements of Article Nine of the UCC and plaintiff does not point to any authority for the proposition that the subjective intent—or purported bad faith—of a party to the

34

sale renders an otherwise fully compliant sale commercially unreasonable.[7] Plaintiff does not present any evidence or argument to the contrary or establish any genuine issues of material fact pertinent to a determination of the sale's commercial reasonableness.

We also separately observe plaintiff does not make any arguments under the UCC addressed to the court's award of summary judgment on his claim the sale was commercially unreasonable. For that reason, alone, plaintiff has abandoned any claim the motion court erred by granting summary judgment on the cause of action. See Drinker Biddle & Reath LLP v. N.J. Dep't of L. & Pub. Safety, Div. of Law, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (explaining an issue not briefed on appeal is deemed abandoned), and we affirm the court's summary-judgment award on the count on that basis as well.

Plaintiff also challenges the court's summary-judgment award on his other cause of action, which plaintiff does not reference in his brief on appeal but the complaint defines as a claim for intentional interference with a prospective

---

[7] Plaintiff argues that Siva's good or bad faith was pertinent but only because Siva had argued in support of the summary-judgment motion that even if the Bank's sale to him had "not been 'commercially reasonable,' he [Siva] was a good faith purchaser within the meaning of N.J.S.A. 12A:9-617." Given our determination the sale was commercially reasonable, it is unnecessary to address or determine whether Siva was a good faith purchaser under N.J.S.A. 12A:9-617.

contractual or economic relationship. Plaintiff argues the court erred in granting summary judgment because Siva acted in bad faith by having GMK enter into the April 2017 lease with Wawa following its termination of the Starmar lease in January 2017. Plaintiff contends GMK's entry into the April 2017 lease interfered with his prospective contractual relationship with Patsaros by allowing GMK to receive the rental payments that would have otherwise been paid to Starmar, thereby depriving plaintiff of the benefit of Patsaros's assignment of Starmar's rights to receive rents from Wawa under the original lease Wawa had terminated. We are not persuaded.

To prove a cause of action for tortious interference with a prospective economic advantage, a plaintiff must prove "that it had a reasonable expectation of economic advantage that was lost as a direct result of defendant['s] malicious interference, and that it suffered losses thereby." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 305-06 (2001) (citation omitted). To establish a cause of action for tortious interference with a contract, a plaintiff must prove: (1) an existing contract or reasonable expectation of economic advantage; (2) intentional and malicious interference with that relationship; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages resulting from that interference. Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 49

36

(App. Div. 1997) (citing <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 116 N.J. 739, 752, 563 A.2d 31 (1989)).  "Whether the tort is denominated as an intentional interference with contractual advantage, or future economic advantage, the import is the same."  <u>Jenkins v. Region Nine Hous. Corp.</u>, 306 N.J. Super. 258, 265 (App. Div. 1997).

Under either form of tortious interference, "the means utilized" to cause the interference "may be neither improper . . . nor wrongful," <u>Nostrame v. Santiago</u>, 213 N.J. 109, 123 (2013) (citations omitted), and must "be malicious," <u>Kopp, Inc. v. United Techs.</u>, 223 N.J. Super. 548, 559 (App. Div. 1988).  Determining whether alleged conduct is improper requires consideration of a variety of factors, including "an evaluation of the nature and motive behind the conduct, the interests advanced and interfered with, societal interests that bear on the rights of each party, the proximate relationship between the conduct and the interference, and the relationship between the parties."  <u>Nostrame</u>, 213 N.J. at 122.

Wrongful conduct may include "deceit and misrepresentation," <u>id.</u> at 124, and "violence, fraud, . . . criminal or civil threats, and/or violations of the law," <u>ibid.</u> (quoting <u>E Z Sockets, Inc. v. Brighton-Best Socket Screw Mfg. Inc.</u>, 307 N.J. Super. 546, 559 (Ch. Div. 1996), <u>aff'd</u>, 307 N.J. Super. 438 (App. Div.

1997)).  "[T]he term malice is not used in the literal sense requiring ill will toward the plaintiff," instead, "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse."  Printing Mart-Morristown, 116 N.J. at 751 (citing Restatement (Second) of Torts ch. 37, § Scope, intro. note (Am. L. Inst. 1979)).  A determination of whether a defendant acted wrongfully must be based on the context of the facts presented.  Ideal Dairy Farm, Inc. v. Farmland Dairy Farms, Inc., 282 N.J. Super. 140, 199 (App. Div. 1995).

Measured against these standards, we affirm the motion court's determination that defendants are entitled to summary judgment because plaintiff is without any evidence establishing Siva engaged in any wrongful conduct that interfered with plaintiff's contractual relationship with Patsaros or Starmar.  The gravamen of plaintiff's claim is that when Starmar's lease with Wawa terminated, he lost the benefit of Starmar's assignment of its right to receive Starmar's future rent receipts that Patsaros had pledged to secure the millions of dollars of purely personal obligations Patsaros owed to him.  The record, however, lacks any evidence that Siva acted in any manner, never mind wrongfully or maliciously, affecting Wawa's termination of the lease.

The undisputed facts establish Wawa terminated the lease when it determined in January 2016 that Starmar did not own the property. That Wawa may have known Starmar did not own the property when the lease was first signed, as plaintiff contends, does not matter because plaintiff's claim is that Siva tortiously interfered with his contractual rights and prospective economic advantage—access to the Wawa rental payments—and the record is barren of any evidence Siva, either individually or on behalf of GMK, took any action to cause Wawa to terminate the lease.

Once Wawa terminated the lease, Starmar had no further entitlement to the rents Patsaros had pledged to plaintiff on behalf of Starmar, and Starmar's assignment of the rents became worthless. Plaintiff claims Siva acted maliciously and wrongfully following plaintiff's loss of his access to the rents, arguing Siva should have sought to dissolve Starmar or taken other actions, including transferring the property to Starmar that Patsaros had failed to subdivide, to rescue plaintiff from the repercussions of Starmar's loss of rents due to Wawa's unilateral termination of the lease.

We find no basis in the undisputed facts or pertinent legal principles to conclude that Siva had an obligation to take action to revive the flow of rents to Starmar following the termination of the Wawa lease. Plaintiff ignores that

Patsaros owned forty-five percent of Starmar at that time and that any action reviving Starmar's receipt of the rents from Wawa necessarily required that Siva continue his relationship with Patsaros in Starmar. However, by the time Wawa terminated the lease, Siva had learned Patsaros violated the Starmar operating agreement by pledging his interest in Starmar to the Bank without GMK's or Siva's knowledge or consent; Patsaros had provided as collateral rents due Starmar under the Wawa lease without GMK's and Siva's knowledge or consent; Patsaros had misappropriated for his personal use the rental payments Wawa had paid to Starmar; and Patsaros had failed to take the steps necessary to subdivide the property so that the portion of it that was to be owned by Starmar and leased to Wawa could have been properly conveyed.

Given those circumstances, no reasonable jury could conclude Siva's decision not to take any action to revive Starmar's potential receipt of rents could be characterized as wrongful or malicious. By any measure, Siva's failure to take the actions suggested by plaintiff constituted a reasonable decision not to do any further business with his only co-member of Starmar, Patsaros.

There is no evidence Wawa terminated its lease with Starmar at Siva's request or in anticipation that it would later enter into a lease with GMK, the actual owner of the property. It was only months after Wawa had terminated

40

A-0368-22

the Starmar lease that Siva, on behalf of GMK, entered into the new lease with Wawa. There is no evidence entry into that lease was wrongful or malicious. To the contrary, GMK owned the property on which the Wawa store had been built and, as such, there was no other owner of the property that could serve as Wawa's landlord.

In sum, we agree with the motion court that plaintiff failed to present any evidence that Siva acted wrongfully or maliciously in any manner affecting plaintiff's contractual rights, or anticipated economic advantage, with Patsaros or Starmar. The court correctly granted summary judgment to defendants.

We have considered all the arguments plaintiff asserted in support of his appeal from the summary-judgment orders. To the extent we have not expressly addressed any of the arguments, it is because we have found they are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

41